351 A.2d 617

COMMONWEALTH OF PENNSYLVANIA, Appellant,

v.

Charles COLEY, Appellee (two cases).

Supreme Court of Pennsylvania.

Argued July 1, 1975.

Decided Jan. 29, 1976.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., B. H. Levintow, Philadelphia, for appellant.

Andrew G. Gay, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

Charles Coley was convicted by a jury in Philadelphia of murder in the first degree, attempted robbery and criminal conspiracy. Subsequently, the trial court ordered a new trial. The Commonwealth filed an appeal in this Court from the order granting a new trial as it affected the murder conviction.[1] An appeal was filed in the Superior Court from the order as it affected the robbery and conspiracy convictions. The last mentioned appeal was later transferred here. Both appeals were consolidated for argument in this Court and pose the same legal issues.

At trial the Commonwealth introduced into evidence over timely objection an executed handprinted account of an incriminating oral statement given by Coley to the police.[2] Following the filing of a motion for a new trial, the trial court concluded that evidentiary use at trial of Coley's incriminating statement was proscribed by Rule 130 of the Pennsylvania Rules of Criminal Procedure, and hence, a new trial was required.[3] *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972). The trial court's conclusion that the admission of evidence of Coley's incriminating statement at trial was error was based

---

1. Since the issue involved is purely one of law the Commonwealth may appeal. See *Commonwealth v. Melton,* 402 Pa. 628, 168 A.2d 328 (1961).

2. A pretrial motion to suppress this evidence was denied after an evidentiary hearing.

3. An executed, typewritten confession given by Coley was also introduced into evidence but since the handprinted statement was the first to be obtained and since the typewritten statement was substantially the same as the handprinted one, we shall limit our analysis to the circumstances surrounding the handprinted statement *Commonwealth v. Davis,* 460 Pa. 644, 334 A.2d 275 (1975); *Commonwealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974).

solely on this Court's opinion in *Commonwealth v. Johnson*, 459 Pa. 171, 327 A.2d 618 (1974).

We believe the lower court's reliance on *Commonwealth v. Johnson*, supra, was inappropriate. Further, since we have determined that no violation of the *Futch* rule exists under the circumstances of this case, we reverse.

The relevant facts upon which we have made our determination are as follows:

On October 20, 1973, a robbery and fatal shooting occurred at the Kesmon Hotel in Philadelphia. [Hereinafter hotel robbery.] On October 28, 1973, two men attempted a robbery at the Mt. Carmel Baptist Church in Philadelphia.[4] [Hereinafter church robbery.] During the church robbery, a police officer, Detective Ross, was shot, though not fatally. Emmett Barrett was quickly apprehended by police following the church robbery. A .32 caliber handgun was recovered by police at that time. The other participant in the church robbery escaped capture. As a result of statements made by Barrett to police concerning the church robbery, a warrant for Coley's arrest was issued for his participation in the church robbery. Inter alia, Barrett told the police he acquired the gun from Coley sometime earlier.

Sometime subsequent to October 28, 1973 but prior to Coley's arrest, a ballistic test of the bullets recovered from the body of Caldwell, the person who was fatally shot in the hotel robbery, and from Detective Ross indicated that both bullets were fired from the same gun. But the police never used this information to obtain a warrant for the arrest of Coley for the hotel robbery.

Between October 28, 1973 and November 30, 1973, the date on which Coley was arrested, the Philadelphia police learned that Coley had a fiancee in Virginia. The police

---

4. Coley's conviction was a result of charges brought against him for his participation in the hotel robbery and fatal shooting, not for any involvement in the church robbery.

then supplied the Federal Bureau of Investigation with this information. Pursuant to this information, a federal warrant for Coley's arrest was issued for flight to avoid prosecution. On November 30, 1973, Coley surrendered to federal authorities in Philadelphia. An arraignment was held in a federal magistrate's court at which time the federal officials withdrew the federal charges against Coley. At that arraignment Coley had counsel, apparently supplied by federal officials.

At 12:00 p. m. on November 30, 1973, Coley was transferred to the custody of Philadelphia police by federal officials. The Philadelphia police arrested Coley pursuant to the outstanding warrant for his participation in the church robbery and pursuant to facts sufficient to give the officers probable cause to arrest for participation in the hotel robbery. For present purposes we can assume Coley was arrested without a warrant for his participation in the hotel robbery only.[5] Moreover, the police informed Coley, at the time of his arrest, of the reason for his arrest, that is, his participation in the hotel robbery and fatal shooting of Caldwell.

Coley was then taken to the Police Administration Building where he arrived at 2:45 p. m. on November 30, 1973. At 2:55 p. m., an interview with Coley was conducted by Detective Cleary, one of the two arresting officers. Coley was given his *Miranda* warnings at this time and affirmatively indicated he understood his rights. He

5. Although the arrest warrant for the church robbery was still outstanding, subsequent events indicate the arresting officers were more interested in the hotel robbery. In its opinion granting a new trial, the trial court stated that Coley was arrested pursuant to the warrant. In his findings of fact from the suppression hearing, the hearing court judge stated nothing about the warrant but indicated that probable cause existed for Coley's arrest for his participation in the hotel robbery. Because the record strongly indicates that Coley was indeed arrested for the hotel robbery, we shall assume he was arrested without a warrant. Moreover, the lower court's finding that the arrest was based on probable cause is not now challenged, thus Coley's arrest must be considered legal.

expressed a willingness to answer questions but denied any involvement in the hotel robbery. This interview was concluded at 4:25 p. m. Between 4:25 and 5:10 p. m., Coley was left alone. From 5:10 to 5:20 p. m., he was taken to the men's room and given water. At 5:20 p. m. until 6:05 p. m., Detective Cleary again interviewed Coley. Coley again denied involvement in the hotel robbery.

At 6:05 p. m., Lt. Patterson, the other arresting officer, entered the polygraph room where Coley was being interviewed. Cleary left and Patterson gave Coley his *Miranda* warnings. Patterson interviewed Coley from 6:05 p. m. until 6:30 p. m. and during this time Coley made an oral admission of involvement in the hotel robbery. Lt. Patterson then left the room and told Detective Cleary that Coley would give him an account of the hotel robbery.

At 6:30 p. m., Cleary entered the room and again gave Coley his *Miranda* warnings; nonetheless, Coley proceeded to give Cleary a statement admitting his participation in the hotel robbery.[6] As it was given, Coley recorded the statement in handprinting. When completed, it was signed by Coley.

Disregarding the period of time used in the transportation of Coley from the custody of the federal authorities to the City Police Administration Building, which was obviously necessary and free from coerciveness, the instant case involves a delay of three hours and thirty-five minutes during which period two interviews were conducted. The two interviews totaled two hours and forty minutes. The first interview lasted for one hour and thirty minutes; the second interview, during which Coley incriminated himself, lasted one hour and ten minutes. The interviews were interrupted by a fifty-five minute interval during which Coley was allowed to take care of his physical needs and to rest.

6. The statement also contained references to the church robbery which are not here relevant.

Moreover, the suppression hearing court found on adequate and credible evidence that Coley was not under the influence of alcohol or narcotics, that he understood his constitutional rights and knowingly, willingly and voluntarily waived them, that he was under no mental or physical impairment. Coley was twenty-one years old at the time of his arrest and had an eleventh grade education. Finally, the suppression hearing court concluded that Coley's admissions were voluntary.

The trial court's reliance on *Commonwealth v. Johnson,* supra, was inappropriate because facts present therein and important to the decision in the case are not present here. The trial court was apparently influenced by the fact that the instant case involved a delay of three hours and thirty-five minutes or a period approximating the four hour delay period in *Johnson,* supra. But the mere comparison of time periods is not a sufficient inquiry. The *Futch* rule has as its purpose the elimination of circumstances which are coercive in nature, including constant and prolonged interrogation. See *Commonwealth v. Young,* 460 Pa. 598, 334 A.2d 252 (1975). See also *Commonwealth v. Bryant,* 461 Pa. 3, 334 A.2d 603 (1975) (Opinion in Support of Affirmance), and *Commonwealth v. Hamilton,* 460 Pa. 686, 334 A.2d 588 (1975) (Opinion in Support of Affirmance). Thus, the *Futch* issue necessitates an examination of all the facts to determine what degree of coerciveness exists in any given case. This is not to say that the three-pronged inquiry outlined in *Commonwealth v. Williams,* 455 Pa. 569, 319 A.2d 419 (1974), is not the formula to be used in determining if there was a violation of the *Futch* holding. But it is a mere formula designed to effectuate a purpose and only when the purpose of *Futch,* namely, to prevent an accused from being subjected to coercive influences and circumstances, is advanced will *Futch* be applied to suppress a confession.

The purpose of *Futch* was advanced in *Johnson,* supra, because there were attending circumstances which persuaded a majority of the Court that a great degree of coerciveness existed. Therein the accused was only fourteen years of age and was questioned without the presence of or prior consultation with his parents or counsel, during the late hours of night and on into the early hours of morning. Such coercive circumstances which were the operative facts in the application of *Futch* in *Johnson* are not present here. Thus, *Johnson,* supra, served the purpose of the *Futch* rule but it did so because of facts not present in this case and therefore, *Johnson,* supra, is not determinative here.

Having distinguished *Johnson,* supra, and reiterated the purpose of the *Futch* rule, and with that purpose in mind, we now turn to the three-pronged test and apply it to the instant case. In order for evidence to be suppressed under *Futch* there must be (1) an unnecessary delay, (2) evidence obtained from the accused which is a product of the delay, that is, there must be a "nexus" between the delay and the evidence, and (3) the evidence must be prejudicial. See *Commonwealth v. Williams,* supra, and *Commonwealth v. Young,* supra. The instant case requires a consideration of the first two requirements.

We thus turn to the initial question of whether the delay here was "unnecessary." A review of the cases involving this question indicates that the shortest period of time which has ever resulted in the suppression of evidence was four hours in *Commonwealth v. Johnson,* supra. But we have already pointed out the important differences between that case and this one. Here the delay was only three hours and thirty-five minutes. Coley willingly waived his *Miranda* rights and agreed to be questioned for a period of time. The agreeing to questioning by the police necessitated the delay. Thus, because the period of time is so short and because Coley

agreed to be questioned, we do not think this delay can be considered "unnecessary."

Our conclusion is supported by other decisions of the Court, particularly *Commonwealth v. Edwards,* 463 Pa. 129, 344 A.2d 460 (1975); *Commonwealth v. Young,* supra, and *Commonwealth v. Whitson,* 461 Pa. 101, 334 A. 2d 653 (1975).

In *Edwards,* the evidentiary use at trial of the defendant's inculpatory statement was asserted as error and in violation of the *Futch* rule because of the lapse of five hours between the time of arrest and the giving of the inculpatory statement. This Court unanimously rejected this argument and affirmed the conviction in a "per curiam" order. In *Young,* the defendant was arrested at 7:15 a. m. and initially incriminated himself at 1:15 p. m. This Court ruled evidence of the incriminations was properly admitted at trial and no violation of the *Futch* rule occurred. In *Whitson,* there was a delay of four hours between the arrest and the self-incriminations, but this Court held the *Futch* rule did not proscribe evidence of the self-incriminations at trial.

Even though we have concluded that the delay was not unnecessary, we shall examine the nexus question because our conclusion, from which follows our view that the purpose of *Futch* would not be advanced by its application here, is further supported by such an examination. The *Futch* rule is not inflexible and although we make distinctions between the nexus and the unnecessary delay inquiries, both are interrelated because of the purpose of the *Futch* rule. Our concern is not centered so much on the results under any particular branch of the three-pronged inquiry as it is with whether or not the purpose of *Futch* will or will not be advanced by its application in any given case. Both branches, that is, the delay and nexus branches, of the three-pronged inquiry aid in determining whether coercive circumstances exist in a sufficient degree such that the application of the *Futch* rule will ef-

fectuate its purpose. Just as the length of the delay aids in the determination of whether the delay is necessary, it also aids in the determination of whether a nexus exists. So too the circumstances surrounding a delay aid in the determination of whether a delay is necessary, just as they aid in determining if a nexus exists. *Commonwealth v. Boone,* 467 Pa. ——, 354 A.2d 898 (1975). See also Comment: *Pennsylvania Supreme Court Review,* 1974, 58 Temple L.Rev. 527, 635 (1975).

 The Comment points out that the three-pronged inquiry we use should not be considered an inflexible or mechanical device or the determinations made by this Court would have to be considered erratic and unpredictable. Rather, as suggested in the Comment, our three-pronged inquiry is merely a method of analysis to examine the totality of the circumstances to determine if coercion in a sufficient degree exists to warrant rejection of the confession. Our emphasis on the delay is merely a recognition of the fact that a delay in and of itself, if sufficiently long, when viewed in relationship to the accused, including such factors as age and intelligence, may cause a sufficient amount of psychological coercion to result in an involuntary confession. Our inquiries into such matters as why the police allowed a delay, *Commonwealth v. Whitson,* supra, merely recognize the obvious reality that some delays and thus some psychological coercion are, as a practical matter, absolutely necessary without regard to the effect on a given accused. But the mere fact that the police offer no excuse for a short delay does not lead to the conclusion that a delay was unnecessary and therefore sufficiently coercive to warrant the application of *Futch.* Ultimately we look to the totality of the circumstances to determine coercive circumstances, including the length of a delay and the effect on the accused and then we evaluate the situation as a question of degree.

■ Thus, with the view that the necessity of a delay and the nexus between a delay and confession are inter-related, we turn to the question of a nexus. The nexus between the delay and confession is established only where the accused proves that the confession was a product of the delay, that is, the delay is shown to be a contributing factor in obtaining the confession. *Commonwealth v. Young*, 460 Pa. 598, 334 A.2d 252 (1975); *Commonwealth v. Rowe*, supra. Again, the totality of the circumstances must be examined to determine the degree of coercion in order to make this determination.

■ Coley was given his *Miranda* warnings repeatedly. He voluntarily agreed to questioning. He was an adult and was questioned in the day time without any showing that he was tired or otherwise physically impaired. He was subjected to no threats or promises. Finally, Coley was of average intelligence and had an eleventh grade education.

Coley was not constantly subjected to questioning; rather, on the contrary, he was allowed to rest between interviews for almost an hour. Further, the total delay was only three hours and thirty-five minutes. Only two police officers, those who arrested Coley, questioned him.

Under these facts we are convinced this case is controlled by this Court's decision in *Commonwealth v. Young*, supra, which involved an adult, rather than *Commonwealth v. Johnson*, supra, which involved a minor. In *Young*, supra, we ruled that no proof existed to establish the nexus between the delay and the confession. There the delay lasted six hours, two and one-half hours more than here; and the length of delay is always indicative of the existence or nonexistence of a nexus. *Commonwealth v. Boone*, supra. In *Young*, supra, the police questioned the accused in two sessions which were interrupted by a period of rest, as was Coley. There the accused was an adult, as was Coley at the time of his ar-

rest. No other coercive circumstances exist in this case.[7] Thus, we conclude that no reasonable relationship exists between the delay and confession. *Commonwealth v. Young,* supra. And see *Commonwealth v. Bryant,* supra; *Commonwealth v. Hamilton,* supra, and *Commonwealth v. Smith,* 463 Pa. 393, 344 A.2d 889 (1975).

■ Having analyzed all the facts and circumstances, we hold that since the purpose of *Futch,* the elimination of coercive circumstances, including constant and prolonged interrogation, will not be advanced by the application of the rule, the *Futch* rule is inapplicable. It is fundamental that no rule of law should ever be applied unless the purpose for which it was developed will be served by its application in a given case.

■ Since we have concluded the admission into evidence of Coley's incriminating statements was not a proper basis for the granting of a new trial, it is necessary to consider Coley's alternative argument for a new trial. Coley argues that the trial judge lent undue strength to the Commonwealth's case when he reviewed the evidence during his instructions to the jury. We need not reach the merits of Coley's argument since it was not properly preserved for review by this Court.

Although counsel objected to the instructions to the jury on the grounds here asserted in compliance with

7. The testimony indicates that Coley was also confronted with the knowledge on the part of the police of the results of the ballistic test and Barrett's statements between 5:20 p. m. and 6:30 p. m. The precise time cannot be determined because the lower court made no finding in this regard. The Commonwealth's testimony indicates he was confronted with it by Lt. Patterson immediately before agreeing to confess. Coley testified that Detective Cleary informed him of it between 5:20 p. m. and 6:05 p. m. Even assuming Coley's testimony is believed on this matter, the confrontation represents an added circumstance, which though not determinative in itself, *Commonwealth v. Doamaral,* 461 Pa. 517, 337 A. 2d 273 (1975); *Commonwealth v. Abi-Ion Hanifah Bey,* 462 Pa. 533, 341 A.2d 907 (1975), when considered with all the other circumstances mitigates against the delay itself being considered as sufficiently long to establish a nexus. See *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972).

Pa.R.Crim.P. 1119(b), he did not include this assignment of error in the post-verdict motion for a new trial. Further, even though counsel reserved the right to file additional reasons for a new trial after the record was transcribed, our review of the record discloses that no additional reasons were presented in writing to the trial court. Since the issue was not properly presented to the trial court, that is, by written post-verdict motion, it was not properly preserved for our review.[8] Pa.R.Crim.P. 1123(a); *Commonwealth v. Irwin*, 460 Pa. 296, 333 A.2d 735 (1975); *Commonwealth v. Blair*, 460 Pa. 31, 331 A. 2d 213 (1975).

The order of the trial court granting a new trial is therefore reversed. The record is remanded to the trial court for the purpose of imposing sentence.

POMEROY and NIX, JJ., concur in the result.

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joined.

ROBERTS, Justice (dissenting).

This is another case[1] in which the Philadelphia police have deliberately refused to comply with Rule 130 of the

**8.** Although oral motions have been deemed sufficient to preserve an issue for appeal where the relevant events occurred prior to our decision in *Commonwealth v. Blair*, supra, see *Commonwealth v. Bailey*, 463 Pa. 354, 344 A.2d 869 (1975), neither the record, nor the opinion of the trial court, nor Coley's brief indicates in any way that the issue was brought before the trial court on oral motion following trial and conviction. As such the exception to our rule in *Blair*, supra, has no application here.

**1.** In just the last two years this Court has seen numerous cases where the Philadelphia police have intentionally delayed taking the arrested person to preliminary arraignment. See, *e. g., Commonwealth v. Eiland*, 450 Pa. 566, 301 A.2d 651 (1973), (25 hour delay); *Commonwealth v. Tingle*, 451 Pa. 241, 301 A.2d 701 (1973), (21 hour delay); *Commonwealth v. Riggins*, 451 Pa. 519, 304 A.2d 473 (1973), (17 hour delay); *Commonwealth v. Dutton*, 453 Pa. 547, 307 A.2d 238 (1973), (26 hour delay); *In re Geiger*,

Pennsylvania Rules of Criminal Procedure by failing to take an arrested person "without unnecessary delay" to preliminary arraignment.[2] The plurality's acquiescence

454 Pa. 51, 309 A.2d 559 (1973), (24 hour delay); *Commonwealth v. Dixon,* 454 Pa. 444, 311 A.2d 613 (1973), (15 hour delay); *Commonwealth v. Simms,* 455 Pa. 599, 317 A.2d 265 (1974), (22 hour delay); *Commonwealth v. Hancock,* 455 Pa. 583, 317 A.2d 588 (1974), (19 hour delay); *Commonwealth v. Williams,* 455 Pa. 569, 319 A.2d 419 (1974), (27 hour delay); *Commonwealth v. Cherry,* 457 Pa. 201, 321 A.2d 611 (1974), (15 hour delay); *Commonwealth v. Dreuitt,* 457 Pa. 345, 321 A.2d 614 (1974), (24 hour delay); *Commonwealth v. Sanders,* 458 Pa. 281, 327 A.2d 43 (1974), (17 hour delay); *Commonwealth v. Parker,* 458 Pa. 381, 327 A.2d 128 (1974), (31 hour delay); *Commonwealth v. Johnson,* 459 Pa. 171, 327 A.2d 618 (1974), (10 hour delay); *Commonwealth v. Wilson,* 458 Pa. 285, 327 A.2d 621 (1974), (14 hour delay); *Commonwealth v. Wilson,* 463 Pa. 1, 329 A.2d 881 (1974), (9 hour delay); *Commonwealth v. Ashburn,* 459 Pa. 677, 331 A.2d 167 (1975), (18 hour delay); *Commonwealth v. Saunders,* 459 Pa. 677, 331 A.2d 193 (1975), (9 hour delay); *Commonwealth v. Smalls,* 460 Pa. 436, 333 A.2d 853 (1975), (9 hour delay); *Commonwealth v. Barilak,* 460 Pa. 449, 333 A.2d 859 (1975), (22 hour delay); *Commonwealth v. Bryant,* 461 Pa. 3, 334 A.2d 603 (1975), (18 hour delay); *Commonwealth v. Tucker,* 461 Pa. 191, 335 A.2d 704 (1975), (12 hour delay); *Commonwealth v. Cullison,* 461 Pa. 301, 336 A.2d 296 (1975), (23 hour delay); *Commonwealth v. Doamaral,* 461 Pa. 517, 337 A.2d 273 (1975), (12 hour delay); *Commonwealth v. Bey,* 462 Pa. 533, 341 A.2d 907 (1975), (17 hour delay); *Commonwealth v. Palmer,* 463 Pa. 26, 342 A.2d 387 (1975), (18 hour delay); *Commonwealth v. Smith,* 463 Pa. 393, 344 A.2d 889 (1975), (14 hour delay).

Periods of delay are calculated from time of arrest until preliminary arraignment. Because the exact time of arraignment is usually not in the record the delay in the cases listed above may have been longer than shown.

2. Pa.R.Crim.P. 130 provides:
"When a defendant has been arrested without a warrant in a court case, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him and he shall be given an immediate preliminary arraignment."

Formerly Rule 118, renumbered Sept. 18, 1973, effective Jan. 1, 1974. Originally enacted as part of Rule 118 in June 1964, effective January 1, 1965.

Rule 130 imposed no change in the required criminal procedure, in fact, it was a mere codification of a common law rule at least 200 years old: "In point of fact it has long been the rule that an officer is under a duty to bring an arrested person before a magistrate immediately. Such was the common-law rule in regard to criminal procedure, and is the rule today." Kauper, Judicial Ex-

in such police conduct compels dissent. By reversing the order of the trial court [3] suppressing statements made during unnecessary delay, the plurality: (1) does not fairly characterize the facts of the case; (2) misapprehends the constitutional foundations of Rule 130; (3) overlooks the deterrent effect of the exclusionary rule this Court announced in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972); [4] (4) incorrectly describes the analysis used by the Court in *Futch* and subsequent cases; and (5) reaches the wrong result.

## I

Though there is no dispute concerning the facts of this case, the plurality does not accurately characterize what transpired. Appellee Charles Coley was taken into custody by city police at noon on November 30, 1973. At 2:45 p. m. he was brought to the police administration building,[5] the same building in which he was arraigned the following morning. Although an interrogating offi-

amination of the Accused—A Remedy for the Third Degree, 30 Mich.L.Rev. 1224, —— (1932).

See also 4 W. Blackstone, Commentaries * 296 (1765): "Immediately after the arrest, the delinquent should be taken before a justice of the peace, who shall examine the circumstances of the alleged crime . . . ."

3. After a suppression hearing, the trial court denied "defendant's petition for suppression of his statements." An oral motion for reconsideration was denied. After a jury trial in which the statements were admitted, appellee was convicted. Motion for new trial was filed. The trial court granted the motion for new trial concluding that the statements should have been suppressed.

4. The arrest in this case took place more than a year and a half after the decision of this Court in *Futch*.

5. Appellee was taken into custody at the federal building at 9th and Chestnut St., in Philadelphia. As the police log shows, he was taken to the police administration building at 8th and Race St.,—four blocks away—at 2:45 p. m. The log fails to explain why it took the police 2 hours and 45 minutes to transport appellee four blocks. The plurality ignores this discrepancy stating, without any support in the record: "the period of time used in the transportation of Coley . . . was obviously necessary and free from coerciveness . . . ."

cer testified that pre-arraignment administrative processing could have been completed in less than one hour,[6] appellee was detained for more than 13 hours and not arraigned until some time after 1:00 a. m., on December 1, 1973.[7] Despite the custodial detention of more than 13 hours, the plurality states, "the instant case involves a delay of three hours and thirty-five minutes."[8] To the person repeatedly questioned in the inherently coercive atmosphere of the police station,[9] not knowing when he will get the preliminary arraignment to which he is constitutionally entitled,[10] a 13 hour delay is not made one minute shorter by a gloss[11] on the facts in the record.

**6.** Suppression hearing transcript at 55.

**7.** In this case, as with many others which have been before this Court, the police log indicates with great detail even the least important event during the period following arrest. The final entry, however, the actual time of arraignment remains unspecified. Thus we rarely can determine the total length of the delay. See *Commonwealth v. Smith,* 463 Pa. 393, 398, 344 A.2d 889, 891 (1975) (dissenting opinion of Roberts, J., joined by Manderino, J.).

**8.** Because of its failure to recognize that there is a fourth amendment basis to Rule 130, see Part II infra, the plurality measures delay only until the time of the statement not to the time of preliminary arraignment. Even using its standard, however, the calculation is suspect. Appellee was arrested at noon and made the inculpatory statements sought to be admitted some time after 6 p. m.

**9.** See, Driver, Confessions and The Social Psychology of Coercion, 82 Harv.L.Rev. 42; O'Hara, Fundamentals of Criminal Investigation at 99, as quoted in *Miranda v. Arizona,* 384 U.S. 436, 449–50, 86 S.Ct. 1602, 1615, 16 L.Ed.2d 694 (1966).

**10.** See *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54; *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); cf. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**11.** Repeated interrogations are not made any more acceptable by calling them "interviews"; periods of isolation handcuffed to a metal chair are not made any more tolerable by calling them "rest." Even engaging in such a rationalizing process does not avoid the conclusion that the police are ignoring the requirements of Rule 130.

The plurality states:

> "Coley was given his *Miranda* warnings . . . and affirmatively indicated he understood his rights. He expressed a willingness to answer questions . . . ."

Review of the record reveals that the basis for the plurality's conclusion is nothing more than appellee's "yes" and "no" answers to the police questions read from a card when he was first taken into custody.

Even assuming that one word answers in those circumstances might constitute a waiver [12] of the right to remain silent, appellee's assent to answer questions cannot be construed as giving the police an unlimited privilege to interrogate until a confession is obtained. Moreover, the plurality's statement that appellee's "agreeing to questioning by the police necessitated the delay" is completely untenable. Appellee repeatedly denied involvement in the crime during the first two interrogation sessions which lasted for more than two hours. Denying involvement does not necessitate delay for further questioning—unless the plurality is suggesting that the police have a right to interrogate until they produce a confession.

Rule 130 is clear. As the cases show, the only delay to be tolerated is that necessary for administrative processing.[13] Delay for interrogating the arrested person does not constitute a necessary delay. American Law Institute, Model Code of Pre-Arraignment Procedure, § 130.2. Some police, however, continue to read the rule as though it allows custodial detention and interrogation until a confession is obtained. The "Standard

---

**12.** A waiver must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). See also Note, Interrogations in New Haven: The Impact of Miranda, 76 Yale L.J. 1519 (1967); Note, 5 Stan.L.Rev. 459, 477 (1953) ("if the privilege is easily waived, there is really no privilege at all").

**13.** See cases cited in note 14, infra.

procedure" is described by Detective Cleary in his testimony in this case:

Q. Now after you took the first statement from the defendant, which began at 2:55 p. m. and ended at 4:25 p. m., why did you detain him further?

A. Why did I detain him further?

Q. Yes, Sir.

A. Because it's customary to spend some time with the defendant.

Q. Well, you already interviewed him at that time, and he gave a statement denying any involvement in the Caldwell shooting, didn't he?

A. Yes, sir.

Q. All right. Now, after he denied that, why did you keep him in your homicide division?

A. To further interview him concerning the same case.

Q. For what purpose?

A. To gain an admission to the incident.

This colloquy indicates two things which the plurality fails to recognize: (1) the 13 hour delay between arrest and preliminary arraignment was unnecessary and the evidence obtained was indeed a product of the delay: [14]

14. As such, the statements must be suppressed. *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972); *Commonwealth v. Bey*, 462 Pa. 533, 341 A.2d 907 (1975); *Commonwealth v. Cullison*, 461 Pa. 301, 336 A.2d 296 (1975); *Commonwealth v. Barilak*, 460 Pa. 449, 333 A.2d 859 (1975); *Commonwealth v. Showalter*, 458 Pa. 659, 328 A.2d 841 (1974); *Commonwealth v. Wilson*, 458 Pa. 285, 327 A.2d 621 (1974); *Commonwealth v. Johnson*, 459 Pa. 171, 327 A.2d 618 (1974); *Commonwealth v. Parker*, 458 Pa. 381, 327 A.2d 128 (1974); *Commonwealth v. Saunders*, 458 Pa. 281, 327 A.2d 43 (1974); *Commonwealth v. Cherry*, 457 Pa. 201, 321 A.2d 611 (1974); *Commonwealth v. Williams*, 455 Pa. 569, 319 A.2d 419 (1974); *Commonwealth v. Dixon*, 454 Pa. 444, 311 A.2d 613 (1973); *Commonwealth v. Wayman*, 454 Pa. 79, 309 A.2d 784 (1973); *In re Geiger*, 454 Pa. 51, 309 A.2d 559 (1973); *Commonwealth v. Dutton*, 453 Pa. 547, 307 A.2d 238 (1973); *Commonwealth v. Peters*, 453 Pa. 615, 306 A.2d 901 (1973); *Commonwealth v. Tingle*, 451 Pa. 241, 301 A.2d 701 (1973).

and, (2) unless the courts of the Commonwealth are diligent in excluding such improperly obtained evidence, some police will feel free to continue to ignore Rule 130, the sound policies upon which it is based, and the prior decisions of this Court.

## II

Rule 130 protects rights guaranteed by both the Fourth and Fifth Amendments to the United States Constitution.[15] A federal rule,[16] similar to Rule 130, was described by Justice Frankfurter in *McNabb v. United States*, 318 U.S. 332, 343–44, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943):

"Legislation such as this, requiring that the police must with reasonable promptness show legal cause for

**15.** U.S.Const. amend. IV provides:
"The right of the people to be secure in their persons . . . against unreasonable seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the person or things to be seized."
U.S.Const. amend. V provides in relevant part:
"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."
The fourth amendment is applicable to state proceedings per the fourteenth amendment. *Ker v. California*, 374 U.S. 23, 83 S. Ct. 1623, 10 L.Ed.2d 726 (1963). The fifth amendment's protection against compulsory self-incrimination is also applicable to the states through the fourteenth amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
See also, Pa.Const., art. I, § 8 which provides:
"The people shall be secure in their persons . . . from unreasonable . . . seizures, and no warrant to . . . seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath of affirmation subscribed to by the affiant;" and Pa.Const., art. I, § 9 which provides in relevant part:
"In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself."

**16.** Fed.R.Crim.P. 5(a).
"Rule 118 [now Rule 130] of the Pennsylvania Rules of Criminal Procedure parallels Rule 5(a) of the Federal Rules of Criminal Procedure which provides that '[a]n officer making an arrest . . . shall take the arrested person without unnecessary delay before the nearest available commissioner.'"
*Commonwealth v. Futch*, supra, 447 Pa., at 393, 290 A.2d at 419.

detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime." [17]

A rule of procedure requiring that persons arrested without a warrant be taken "without unnecessary delay" to preliminary arraignment protects the Fourth Amendment right to a judicial determination of probable cause as a prerequisite to detention. As recently explained by Mr. Justice Powell in *Gerstein v. Pugh,* 420 U.S. 103, 113–114, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975):

"Maximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, but such a requirement would constitute an intolerable handicap for legitimate law enforcement. Thus while the Court has expressed a preference for the use of arrest warrants when feasible, (citations omitted) it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant. (citations omitted)

"Under this practical compromise, a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate."

17. See also *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

Our procedural rules are designed to protect these constitutional rights. In *Commonwealth v. Dixon,* 454 Pa. 444, 446–47, 311 A.2d 613, 614 (1973), Mr. Justice Manderino articulated for the Court the interrelationship of two Pennsylvania Rules of Criminal Procedure which protect the constitutional right to this magisterial determination:

> "The significance of Rule 118 [now Rule 130], requiring arraignment without unnecessary delay, becomes fully apparent when that rule is read together with the requirements of rule 119 [now Rule 140]. . . .
> The fundamental purpose of the preliminary arraignment is, therefore, to guarantee a citizen substantially the same rights to which he is entitled under the Pennsylvania Constitution . . . .. The prohibition in rule 118 against any unnecessary delay between an arrest by an accusatorial authority and a preliminary arraignment minimizes the possibility of any unnecessary abridgement of a citizen's liberty. . . .
> Such an abridgement would, of course, be unconstitutional. The danger of any such unnecessary and unconstitutional restriction of liberty diminishes significantly when a citizen is brought swiftly before a neutral authority . . . .."

The plurality fails to recognize that Rule 130 is designed, in part, to ensure that individuals will not be detained without this constitutionally guaranteed determination of probable cause.[18]

The plurality implies that some delay for questioning is to be tolerated. Provisions of the United States and Pennsylvania Constitutions refute this contention.[19] They mandate that the delay be no more than "a brief

18. By viewing Rule 130 as only relating to coercion, the plurality has overlooked a crucial basis for this Rule. See part IV, infra; U.S.Const., amend. II; Pa.Const., art. I, § 8; *Gerstein v. Pugh,* supra note 17; *Johnson v. United States,* supra note 17.

19. See note 15, supra.

period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh,* supra.

Any notion that police have some absolute right to detain and interrogate an arrested person until a confession is obtained is unfounded. Ours is not an inquisitorial system.[20] Justice Frankfurter stated for the United States Supreme Court in *Watts v. Indiana,* 388 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949):

> "Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused, even under judicial safeguards, but by evidence independently secured through skillful investigation."

Those who dispute a holding that police must take an arrested person without delay [21] to preliminary arraignment dispute the tenets of our adversary system, and the fifth amendment protection against compulsory self-incrimination. The wisdom of our long established rule prohibiting unnecessary delay is beyond question. In

**20.** As Professor Bickel states:
"Ours is an adversary, accusatory system, as opposed to the European inquisitorial system. Police and prosecutors, with us, are supposed to seek justice, of course, but we channel their zeal to the pursuit of evidence of guilt, and train them to rely on the defense to find and present to an impartial third party evidence of innocence. We rely on the collision between prosecution and defense to produce the just result. . . .
This adversary system may not be the best, the most efficient, or ultimately the most just. But the worst and most unjust system is assuredly a mixed one, an adversary system which weighs the scales, contrary to its fundamental premises, in favor of the prosecution."
A. Bickel, The Morality of Consent, at 82 (1975).

**21.** Questions asked incident to administrative processing are, of course, necessary. Interrogation designed to elicit admissions to the crime, such as took place here constitutes unnecessary delay. See American Law Institute, Model Code of Pre-Arraignment Procedure, § 130. 2: "Delay for the purpose of facilitating investigation regarding the arrested person shall not constitute a necessary delay."

1931 the Wickersham Commission [22] investigated the problems of custodial interrogation by police. The Commission's much heralded report concluded that the best remedy for the "third degree" would be "enforcement of the rule that every person arrested charged with crime should be forthwith taken before a magistrate. . . ." [23]

It is patently inconsistent for courts to speak of the fifth amendment's protection against self-incrimination while at the same time straining to justify deliberate police disregard for constitutional, decisional and procedural mandates prohibiting unnecessary delay in order to obtain what are characterized as "voluntary confessions." Former Chief Justice Roger J. Traynor of the California Supreme Court was also troubled by this judicial ambivalence:

> "The Fifth Amendment has long been the life of the party in judicial or legislative proceedings, but it has had no life it could call its own in the pre-arraignment stage. Prosecutors seemed disposed to live happily ever after this double standard. . . . Did we or did we not believe in the privilege against self incrimination? There was never a real confrontation of the question so long as there was a double standard of the privilege." [24]

**22.** National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement (1931).

**23.** Id., at 5.

**24.** Traynor, The Devils of Due Process in Criminal Detection, Detention and Trial, 33 U.Chi.L.Rev. 657, 674 (1966). See Y. Kamisar, Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, in Kamisar, Inbau & Arnold, Criminal Justice in Our Time, at 19–36 (1965); Note, An Historical Argument for the Right to Counsel During Police Interrogation, 73 Yale L.J. 1000 (1964); Sutherland, Crime and Confession, 79 Harv.L.Rev. 21 (1965).

In Heimstra, Abolition of the Right Not to be Questioned, 80 S.African L.J. 187, 194–95 (1963), a Judge of the Supreme Court of South Africa noted our doctrinal inconsistency, saying:

"But in none of the [U.S.] jurisdictions [where there is the privilege against self-incrimination] does it apply to what hap-

Courts should be unwilling—when the record shows, as it does here, a clear pattern of police conduct in violation of our Rule, our cases and our constitutional provisions —to operate under this "double standard." It is regrettable that the plurality today does otherwise.

### III

The plurality has completely overlooked the deterrent effect of the exclusionary rule this Court announced in *Commonwealth v. Futch.* In his dissenting opinion in *Commonwealth v. Saunders*, 459 Pa. 677, 686, 331 A.2d 193, 195, 196, 197 (1975), in which I joined, Mr. Justice Nix stated:

"'This rule of exclusion was not developed primarily because of the unreliability of such evidence but rather because of our determination to require police conduct to comply with our procedural rules."

This deterrent effect was further emphasized by Mr. Justice O'Brien in the opinion of the Court in *Commonwealth v. Cherry*, 457 Pa. 201, 205, 321 A.2d 611, 613 (1974):

"Rule 118 [now Rule 130] . . . and our decision in *Futch*, supra, are specifically designed to put a stop to the practice of arresting an individual and holding him during a lengthy period while continuing the investigation before arraigning him."

pens in the police station. The police interrogate freely, sometimes for seven to eight hours on end. The statements thus extracted are given in evidence. There is the provision that only statements made voluntarily may be given in evidence, but that seems to be interpreted rather liberally, judged by our standards."

See also, Kauper, Judicial Examination of the Accused—A Remedy for the Third Degree, 30 Mich.L.Rev. 1224, —— (1932); Kamisar, Kauper's "Judicial Examination of the Accused" Forty Years Later—Some Comments on a Remarkable Article, 73 Mich. L.Rev. 15, 18 (1974).

In *Mallory v. United States,* Justice Frankfurter writing for a unanimous Court also noted this deterrent effect:

"In order adequately to enforce the congressional requirement of prompt arraignment, it was deemed necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention." [25]

354 U.S. at 453, 77 S.Ct. at 1359.

The plurality errs in stating, "the *Futch* rule has as its purpose the elimination of circumstances which are coercive in nature . . . ." Admittedly, one of the bases of Rule 130 is the elimination of coercive questioning, but *Futch* is a rule of exclusion. It provides a means of ensuring compliance with Rule 130 by removing the incentive to violate the rule. Just as the plurality's failure to consider the fourth amendment basis for Rule 130 makes its analysis incomplete, its lack of recognition of the deterrent effect of the exclusionary rule of *Futch* makes the opinion even more unacceptable.

## IV

Although purporting to follow the principles set forth by this Court in *Commonwealth v. Futch* and its progeny, the plurality's analysis is inconsistent with the rationale of *Futch* and renders Rule 130 nugatory. The plurality states "[O]ur [*Futch*] inquiry is merely a method of analysis to examine the totality of the circumstances to determine if coercion in a sufficient degree exists to warrant rejection of the confession." This is inaccurate.

The plurality's statement says nothing more than "we will exclude confessions found to be coerced." Such a

25. See also *McNabb v. United States,* supra. Cf. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

proposition dates from the 18th century [26] and is the law of this Commonwealth independent of Rule 130 or *Futch*.[27] The plurality's statement is little more than the realization that coerced confessions are to be excluded as unreliable, just as other unreliable evidence may not be admitted.[28] The plurality ignores the Rule's prohibition against unnecessary delay and inaccurately treats it as if only coercion is prohibited.

Rule 130 does more. It mandates a procedure to protect constitutional rights. The mandated procedure is arraignment without unnecessary delay. *Futch* provides a method of ensuring compliance with that mandate. The method is an exclusionary rule to be applied in certain circumstances.[29] *Futch* was much more than a reiteration of an ancient "coercion" principle to which this Court has long adhered.

**26.** See *Bram v. United States,* 168 U.S. 532, 546, 18 S.Ct. 183, 188, 42 L.Ed. 568 (1897);
> "Gilbert, in his treatise on Evidence, (2d ed. published in 1760,) says, at page 139:
> ' * * * But, then, this confession must be voluntary and without compulsion; for our law . . . will not force any man to accuse himself; and in this we do certainly follow the law of nature, which commands every man to endeavor his own preservation; and therefore pain and force may compel men to confess what is not the truth of facts, and consequently such extorted confessions are not to be depended on.' "

See III Wigmore on Evidence § 821 at 324: "Involuntary confessions are excluded because they are untrustworthy, because it offends" the community's sense of fair play and decency "to convict a defendant by evidence extorted from him, and because exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crimes."

**27.** See, e. g., *Commonwealth v. Mosler,* 4 Pa. 264 (1846); *Commonwealth v. Harman,* 4 Pa. 269 (1846); *Commonwealth v. Wyman,* 3 Brewst. 338 (Quarter Sessions 1869); *Commonwealth v. Graham,* 408 Pa. 155, 182 A.2d 727 (1962); *Commonwealth ex rel. Gaito v. Maroney,* 422 Pa. 171, 220 A.2d 628 (1966).

**28.** See, e. g., *Burton v. Pacific Mutual Ins. Co.,* 368 Pa. 613, 84 A.2d 310 (1951); *Stape v. Civil Service Commission,* 404 Pa. 364, 172 A.2d 161 (1961).

**29.** I. e., when the evidence is obtained during an unnecessary delay between arrest and preliminary arraignment.

Thus, the *Futch* analysis is: (1) "Has Rule 130 been violated?" i. e., "Has there been unnecessary delay between arrest and preliminary arraignment?" and (2) "Is evidence obtained from the violation sought to be admitted?" If both answers are in the affirmative then the evidence is to be excluded. The exclusion is determined independent of a "voluntariness" inquiry. The voluntariness, or coercion, analysis is separate, i. e., whether Rule 130 was, or was not, violated, a statement determined to be involuntary will be excluded. These are independent inquiries designed to serve different functions. The *Futch* analysis is not, as the plurality suggests, merely a method of making the voluntariness inquiry.

## V

Application of the *Futch* analysis to the facts of this case results in the conclusion that the trial court properly suppressed the statements.

In determining whether there was unnecessary delay here, the record establishes: (1) more than 13 hours elapsed between arrest and preliminary arraignment; and (2) the delay was unnecessary since, as a detective testified, necessary administrative processing could have been completed within one hour of appellee's arrival at the police administration building. Appellant should have been arraigned early that afternoon instead of the following morning. Thus Rule 130 has been violated. Appellee was not "taken without unnecessary delay before the proper issuing authority."

Next we must consider whether the evidence was obtained as a result of the unnecessary delay. Here there is clear evidence that the only reason appellee was not taken to preliminary arraignment was because police detained and interrogated him "to gain an admission." During two periods of questioning totaling more than two hours, appellee denied involvement in the crime.

After further delay, and further interrogation, appellee made the inculpatory statements sought to be admitted.

The record forcefully establishes as the trial court found, that "the statement procured from Coley was . . . the product of unnecessary delay" and must be suppressed.[30]

The order of the trial court should be affirmed.

MANDERINO, J., joins in this dissenting opinion.